IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DONNA K. MANCUSO,                          )
                                           )
            Plaintiff,                     )        Civil Action No. 05-1650
                                           )
            v.                             )        Judge Terrence F. McVerry
                                           )        Magistrate Judge Lisa Pupo Lenihan
COMMISSIONER OF HEALTH                     )
AND HUMAN SERVICES,                        )        Doc. Nos. 21, 23
                                           )
            Defendant.                     )

## REPORT AND RECOMMENDATION

### I.      Recommendation

It is respectfully recommended that Defendant's Motion for Summary Judgment (Doc. No. 23) be granted, and Plaintiff's Motion for Summary Judgment (Doc. No. 21) be denied. It is further recommended that the decision the Commissioner of Health & Human Services denying Plaintiff's application for disability insurance benefits, pursuant to 42 U.S.C. § 405(g), be affirmed.

### II.     Report

Presently before the Court for disposition are cross motions for summary judgment.

####         A.      Procedural History

On December 6, 2005, Donna Mancuso ("Plaintiff"), by her counsel, filed a timely complaint pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act ("Act"), as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3), requesting review of the final decision of the Commissioner of Health and Human Services ("Commissioner") denying her claim for disability insurance benefits under the Act. (Compl. ¶ 1.) Plaintiff filed an application for disability insurance benefits on September 9, 2003. (R. 80, 100.) In the application, Plaintiff claimed she had been disabled on June

15, 2001 as a result of depression and degenerative cysts on both hips.[1]  (R. 92.)  The state agency

denied her application.  (R. 55.)  Plaintiff timely requested a hearing before an Administrative Law

Judge.  (R. 62.)  On February 7, 2005, a hearing was held before Administrative Law Judge William

E. Kenworthy ("ALJ").  (R. 32-54.)  On March 14, 2005, the ALJ determined that Plaintiff was not

disabled within the meaning of the Act. (R. 12-23.)   Plaintiff proceeded to file a timely appeal to

review the ALJ's decision to the Appeals Council. (R. 7.)  The Appeals Council found no reason to

review the ALJ's decision, and denied Plaintiff's request for review on September 23, 2005 (R. 4-6),

making the ALJ's decision the final decision of the Commissioner.

Plaintiff claims several errors exist in the ALJ's decision.  These errors include: (1) the ALJ

erred in finding at Step 3 that her mental impairment did not meet or medically equal one of the

listings in 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.04 ("Appendix 1");  (2) the ALJ failed to

give proper weight to the opinions of Dr. Franzen, Dr. Goetz, and Ms. McKee in reaching his finding

at Step 3; and (3) the ALJ failed to adopt the opinion of the vocational expert in response to the

second hypothetical question.  Furthermore, Plaintiff states that the evidence clearly demonstrates

she was and still is disabled, and is unable to be gainfully employed in any capacity. (Id at 8.)

**B.**     **Statement of Facts**

Plaintiff's alleged disability began on June 15, 2001. (R. 92.)  At the time of onset, Plaintiff

was thirty-nine years old, which makes her a "younger person" under the regulations.  20 C.F.R.

§404.1563(c).  (R. 98.)  Plaintiff's highest level of education is completion of high school. (R. 98.)

She had been employed as a bus driver, and she continued to work various jobs from November

---

[1]Plaintiff agrees with the Commissioner's determination that her degenerative cysts are not severe enough to constitute a disability.  Plaintiff's Brief in Support of Summary Judgment (" Pl.'s Br.") at 6.

2001 to March 2003. (R. 86-90, 93, 99, 104-110.)

The medical evidence shows that from January of 2003 through December of 2004, Plaintiff received treatment regularly at Family Psychological Associates, Ltd. ("FPA"), for Major Depressive Disorder ("MDD"). (R. 575-633.) A psychiatrist at FPA, Manoj Lekhwani, M.D., conducted a psychiatric evaluation of Plaintiff on January 13, 2003. (R. 356-58, 631-33.) Dr. Lekhwani reported that Plaintiff was well kempt, cooperative, and communicative. (R. 357, 632.) Dr. Lekhwani also noted that her thought processes were goal directed, and did not contain suicidal or homicidal ideations, delusions, or auditory hallucinations. (Id.) He observed that Plaintiff had a sad mood and a depressed affect. (Id.) Dr. Lekhwani diagnosed Plaintiff as having MDD, and assessed a Global Assessment of Functioning[2] ("GAF") at 55-60. (R. 358, 633.) He recommended a combined treatment modality of pharmocotherapy and psychotherapy. (Id.)

From January 28, 2003 through August 16, 2004, as well as on October 26, 2004, the medical records from FPA generally indicate that throughout that period, Plaintiff showed continued improvement and a reduction in symptoms, and a GAF in the 61-70 range[3], with few exceptions. (R. 581, 588-605, 608-611, 614-621, 624-27.) On several visits between January of 2003 and August of 2004,[4] the records show that Plaintiff complained of feeling more depressed, but her GAF was still in the 61-70 range, except for March 4, 2003, when her GAF was in the 51-60 range.[5] (R.

---

[2]The GAF scale is a rating of a claimant's psychological, social, and occupational functioning. American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30 (4th ed. 1994)("DSM-IV"). The GAF rating measures the level of functioning at the time of the evauation and thus generally reflects the individual's need for treatment or care. Id. at 30-35. A GAF in the range of 51-60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 32.

[3]A GAF in the 61-70 range indicates "some mild symptoms, (e.g.,depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

[4]In 2003, the visits are March 4th, July 3rd, and October 30th; in 2004, the visit is July 19, 2004.

[5]See Note 2, supra.

606-07, 612-13, 622-23.) The record further shows that on three visits between September 16, 2004 and October 6, 2004, Plaintiff reported feeling more depressed but maintained a GAF in the 61-70 range (R. 852-87), and between November 11, 2004 and December 2, 2004, Plaintiff was still depressed but her GAF was assessed at 73 and 71, respectively, moving her into the next higher GAF range[6] (R. 578-79).

The medical evidence also shows that on February 13, 2003, Michael D. Franzen, Ph. D., a neuro-psychologist, evaluated Plaintiff's mental status and administered a number of objective tests of cognitive functioning. (R. 359-62.) The results of these tests revealed "signs of variable attentional processes and some deficits with sustained attention and concentration", which are secondary to her current psychiatric condition. (R. 361-62.) Although Dr. Franzen found Plaintiff's depression to be "under fairly good control by treatment", he determined Plaintiff suffers from dysthymic disorder[7] and major depressive disorder, single episode. (R. 361.) He further opined that Plaintiff is likely to demonstrate some depressive symptomology, even when she is at her best. (Id.) He assessed Plaintiff's GAF at 60. (Id.) Dr. Franzen recommended that Plaintiff undergo intensified treatment aimed at reducing her depressive condition, and at teaching her more adaptative coping skills during those times when the dysthymic disorder is more prevalent than her MDD. (Id.)

The medical evidence further indicates that on March 21, 2003, Plaintiff voluntarily admitted herself to Allegheny General Hospital due to severe depression and suicidal thoughts. (R. 364.) At the time of admittance, Plaintiff received an initial mental status examination. (Id.) The initial exam

---

[6]A GAF range of 71-80 indicates no more than slight impairment in social, occupational, or school functioning. DSM-IV at 32.

[7]An individual diagnosed with dysthymic disorder generally possesses a "chronically depressed mood that occurs for most of the day more days than not for at least 2 years." Such individuals describe their mood as "sad or down in the dumps." DSM-IV at 345-349.

revealed that Plaintiff was alert, orientated, and cooperative, with fair eye contact.  (Id.) However, Plaintiff presented with a moderate degree of anxiety, a severely depressed mood, constricted affect, slow speech, thoughts of hopelessness, and suicidal ideations.  (Id.)   She did express her desire to "get well and return home." (Id.)  The treating physician, Dr.  Kambhampati, assessed Plaintiff with having a GAF of 40[8] and adjusted Plaintiff's medication.  (R. 366-67.)  The medication adjustment proved successful, as it eliminated her suicidal thoughts, and improved her mood.  (R. 365.)  She was then discharged on March 26, 2003.  (Id.)

On October 23, 2003, a Residual Functional Capacity ("RFC") Assessment - Physical was completed by a physician on behalf of the Pennsylvania Bureau of Disability Determination ("DDS"). (R. 536-43.)  The DDS physician determined that Plaintiff could occasionally lift objects weighing twenty pounds, could frequently lift objects weighing up to ten pounds; could stand or walk and sit six hours in an eight-hour workday; had the unlimited ability to push and pull items; had no postural limitations except for climbing ladders, ropes or scaffolding; had no environmental limitations except for concentrated exposure to extreme cold, wetness, and vibration; and had no limitations with regard to manipulation, vision, or communication.  (R. 537-40.)  The ALJ concluded that the DDS physician's RFC - Physical showed that Plaintiff is capable of performing work at the light exertional level.  (R. 19.)

On November 21, 2003 (report dated December 24, 2003), Dr. John Mills, PhD., performed a consultative  clinical  psychological  disability  evaluation  of  Plaintiff.   (R. 536-43.)    The

---

[8]A GAF of 40 is at the high end of the 31 to 40 range, and is indicative of "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking or mood (e.g., depressed [wo]man avoids friends, neglects family, and is unable to work . . .)."  DSM-IV at 32.

examination revealed that Plaintiff appeared to be dysphoric, acknowledged depressive cognitions, had some difficulty initiating and sustaining an emotional response, and had very weak abstract thinking.  (R. 545.)  In addition, Dr. Mills noted Plaintiff's fund of acquired knowledge was quite limited and she had limited insight into her condition.  (Id.)  Dr. Mills diagnosed Plaintiff with MDD, single episode of moderate severity, and personality disorder not otherwise specified, with borderline and paranoid features. (R. 546.) He assessed Plaintiff's GAF at 45.[9]  (Id.) As a result of Plaintiff's mental impairments, Dr. Mills found Plaintiff's ability to function was significantly impaired.[10]  (Id.)  Overall, Dr. Mills assessed a poor prognosis to Plaintiff, based on an apparent brain injury and mood disorder of longstanding duration.  (Id.)

On January 16, 2004, state agency Psychologist, Ira Gensemer, Ed. D., reviewed Plaintiff's treatment records  and completed a RFC Assessment - Mental.  (R. 550-567.)  Initially, Dr. Gensemer assessed the degree of limitation in four areas of functions for purposes of determining whether the "B" criteria of the Listing have been met.  In particular, Dr. Gensemer assessed a mild restriction on Plaintiff's activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (R. 560.)  In addition, Dr. Gensemer noted one or two episodes of decompensation of extended duration.  (Id.)  Next, Dr. Gensemer assessed Plaintiff's RFC - Mental and found her to be either not-significantly limited, or moderately limited in every category.  (R. 564-65.)  Dr. Gensemer concluded Plaintiff was capable of performing

---

[9]A GAF rating in the range of 41 to 50 indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[10]As to activities of daily living, Dr. Mills opined that Plaintiff had difficulty sustaining emotional focus and motivation necessary to shop, cook and maintain a residence.  He further opined that her social functioning is extremely poor, and her concentration and persistence are very poor.  Dr. Mills found her pace is adequate due to her average intelligence.  (R. 546.)

6

routine, unskilled, one to two step tasks.  (R. 562, 566.)

On August 30, 2004, Plaintiff entered herself into a substance abuse withdrawal program at Greenbrier Treatment Center.  (R. 568-574). The admitting physician, Scott Cook, M.D., diagnosed Plaintiff as having opiate, benzodiazepine, and nicotine dependence with a history of depression and anxiety. (R. 571-572.)  A consulting psychiatrist at Greenbrier, Rory Marraccini, evaluated Plaintiff and reported that Plaintiff endorsed racing thoughts and feeling  depressed and anxious, had a blunted affect, and experienced decreased concentration. (R. 573.)   Otherwise, Plaintiff's thought process was linear, she denied having suicidal or homicidal ideations, did not appear overtly paranoid, and had fair judgment and insight.  (Id.)  Dr. Marraccini's diagnostic impression indicates opiate and benzodazepine dependence, mood disorder NOS, rule out major depressive disorder, recurrent, severe, without psychosis, and he  assessed Plaintiff's GAF at 33.  (R. 574.)  He adjusted her medication and continued to monitor her symptoms for the rest of her stay.  (Id.)  He did not find any need for an inpatient psychiatric hospitalization.  (Id.)

The record also contains correspondence dated February 10, 2005, from a psychiatrist and licensed social worker with FPA, Dr. Kenneth Goetz, M.D., and Melissa McKee, L.S.W., in which they state that Plaintiff has been treated at FPA since January 8, 2003 and continues to be treated for MDD and is "currently unable to work."  (R. 635.)  Dr. Goetz and Ms. McKee further state that Plaintiff keeps her appointments regularly and complies with treatment recommendations.  (Id.)[11]

In addition to the medical evidence, the record contains statements from Plaintiff regarding her ability to function and limitations on activities of daily living.  Plaintiff stated that when she is

---

[11]The record contains additional medical records documenting Plaintiff's hip problem.  Plaintiff does not contest the ALJ's finding with regard to her hip problem.  Pl.'s Br. at 6.  Thus, the Court does not find it necessary to review this medical evidence.

not depressed, she is able to wash dishes, do laundry, run a vacuum, cook simple meals, feed her dogs, take care of her personal needs, shop for groceries, do some gardening in the summers but not as much as in the past, visit with family and friends weekly, and attend Alcoholics Anonymous ("AA") meetings four times a week.  (R. 41, 44, 122, 125, 146-48.)  However, Plaintiff also stated that she is unable to pay her own bills, does not drive very much because she does not feel safe, does not read very much because she forgets what she has read, has no hobbies, and does not do any housecleaning (other than run a vacuum occasionally).  (R. 42, 122-23, 147.)  Plaintiff further stated that when she is depressed, she does not do anything for two to three days, including eating, showering, doing dishes, going out in public; she stays in her night clothes and either lays in bed or on the couch, with the television on, mostly for noise.  (R. 41, 44-45, 121-22.)

Finally, the record contains evidence from a Vocational Expert ("VE").  At the hearing on February 7, 2005, the ALJ obtained testimony from a Vocational Expert, Francis Kinley, regarding whether jobs existed in the national economy that Plaintiff could perform in light of her RFC.  (R. 50-53.)  The ALJ posed two hypothetical questions to the VE.  First, the ALJ asked the VE whether employment existed for a person with Plaintiff's age, education, training, and work experience, who is capable of performing work at the light exertional level; lifting up to twenty pounds occasionally; capable of standing, walking or sitting up to six hours in an eight-hour work day, but no more than thirty minutes at a time; limited to simple and repetitive tasks; and would not require close interaction and cooperation with co-workers, frequent changes in job assignments, independent decision-making, or similar sources of high level work place stress.  (R. 51.)  The VE responded that jobs existed in the national economy that such a person could perform.  (R. 52.)   The ALJ then followed up with a second hypothetical question which, in addition to the impairments and

limitations in the first question, assumed an extreme impairment in the ability to deal with any level

of work stress or to respond appropriately to supervisors.  (Id.)  The VE responded that no jobs

existed for someone with an extreme impairment.  (Id.)

**C.  "Substantial Evidence" Standard of Review**

In reviewing an administrative determination of the Commissioner, the question before any

court is whether there is substantial evidence in the agency record to support the findings of the

Commissioner. 42 U.S.C. § 405(g).   See also, *e.g.*, Richardson v. Perales, 402 U.S. 389 (1971);

Adorno v.  Shalala, 40 F.3d 43, 46 (3d Cir. 1994).

More specifically, 42 U.S.C. Section 405(g) provides:

> The court shall have power to enter, upon the pleadings and transcript
> of the record, a judgment affirming, modifying, or reversing the
> decision of the Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of the
> Commissioner of Social Security as to any fact, if supported by
> substantial evidence, shall be conclusive . . . .

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion."  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing

Pierce v. Underwood, 487 U.S. 552, 565 (1988)); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir.

1999) (citations omitted).  Although there may be contradictory evidence in the record, and/or

although this Court may have found otherwise, it is not cause for remand or reversal of the

Commissioner's decision if substantial support exists. *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir.

2000) (citation omitted).

The Third Circuit has noted that evidence is not substantial "if it is overwhelmed by other

evidence - particularly certain types of evidence (e.g., that offered by treating physicians) - or if it

really constitutes not evidence but mere conclusion." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) (citing Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981)); see also Gilliland v. Heckler, 786 F.2d 178, 183 (3d Cir. 1986) (citing Kent, supra).   In addition, despite the deference due to administrative decisions in disability benefit cases, "appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981) (citations omitted).  Finally, the "grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Fargnoli v. Massanari, 247 F.3d 34, 44 n. 7 (3d Cir. 2001) (quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).

### D. Disability Evaluation

The issue before the Court for immediate resolution is a determination of whether there is substantial evidence to support the findings of the Commissioner that Plaintiff was not disabled within the meaning of the Act, but had the residual capacity to perform a form of substantial gainful employment.

The term "disability" is defined in 42 U.S.C. Section 423(d)(1)(A) as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

The requirements for a disability determination are provided in 42 U.S.C. Section 423(d)(2)(A):

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

10

other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence  . . . 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. Section 423(d)(3).[12]

Finally, the applicable regulations set forth a more explicit five-step evaluation to determine disability.  The regulations, published at 20 C.F.R. §§404.1501-1529, set forth an orderly and logical sequential process for evaluating all disability claims.[13]  In this sequence, the ALJ must first decide whether the plaintiff is engaging in substantial gainful activity.  If not, then the severity of the plaintiff's impairment must be considered.  If the impairment is severe, then it must be determined whether she meets or equals the "Listings of Impairments" in Appendix 1 of the Regulations which the Commissioner has deemed of sufficient severity to establish disability.  If the impairment does

---

[12]In reviewing a disability claim, the Commissioner must consider subjective symptoms as well as the medical and vocational evidence. See Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984) (explaining that "subjective complaints of pain [should] be seriously considered, even where not fully confirmed by objective medical evidence"); Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) ("Symptoms which are real to the claimant, although unaccompanied by objective medical data, may support a claim for disability benefits, providing, of course, the claimant satisfies the requisite burden of proof.") (citations omitted).

In assessing a plaintiff's subjective complaints, the ALJ may properly consider them in light of the other evidence of record, including objective medical evidence, plaintiff's other testimony, and plaintiff's description of her daily activities. See Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). And so long as a plaintiff's subjective complaints have been properly addressed, the ALJ's decisions in that regard are subject only to the substantial evidence review discussed in Section C, supra. See Good v. Weinberger, 389 F. Supp. 350, 353 (W.D. Pa. 1975) (discussing Bittel and concluding that where "plaintiff did not satisfy the fact finder in this regard, so long as proper criteria were used, [it] is not for us to question"); see also Kephart v. Richardson, 505 F.2d 1085, 1089 (3d Cir. 1974) (noting that credibility determinations of ALJ are entitled to deference).

[13]This evaluation process has been repeatedly reiterated with approval by the United States Supreme Court. See, e.g., Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003).

11

not meet or equal the Listings, then it must be ascertained whether she can do her past relevant work. If not, then the residual functional capacity ("RFC") of the plaintiff must be ascertained, considering all the medical evidence in the file to assess whether the Plaintiff has the ability to perform other work existing in the national economy in light of Plaintiff's age, education, and past work experience.[14]

The finding of the ALJ that Plaintiff is unable to perform her past relevant work will satisfy Plaintiff's burden and the burden then shifts to the Commissioner to show that other work exists in significant numbers in the national economy that accommodates her residual functional capacity. See 20 CFR § 404.1520; Green v. Schweiker, 749 F.2d 1066, 1071 (3d Cir. 1984).[15]  Thus, it must be determined whether or not there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff was not disabled within the meaning of the Social Security Act.

**E.  Analysis**

**1.  Plaintiff's Impairments Do Not Meet the Listing Criteria in Appendix 1**

First, Plaintiff argues that the ALJ's finding that Plaintiff's mental impairments do not meet or equal the criteria of Listing § 12.04 of Appendix 1 is not supported by substantial evidence. Plaintiff specifically disagrees with the ALJ's finding with regard to Parts B and C of Listing

---

[14]The finding of residual functional capacity is the key to the remainder of findings under the regulations.  If the plaintiff's impairment is exertional only, (i.e. one which limits the strength she can exert in engaging in work activity), and if her impairment enables her to do sustained work of a sedentary, light or medium nature, and the findings of age, education and work experience, made by the ALJ coincide precisely with one of the rules set forth in Appendix 2 to the regulations, an appropriate finding is made.  If the facts of the specific case do not coincide with the parameters of one of the rules, or if the plaintiff has mixed exertional and non-exertional impairments, then the rules in Appendix 2 are used as guidelines in assisting the ALJ to properly weigh all relevant medical and vocational facts.  See 20 C.F.R § 404.1569; 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a).

[15]The Commissioner may establish that jobs for a particular claimant exist in the national economy in several ways, including by way of the testimony of a vocational expert.  See Jesurum v. Sec'y of U.S. Dep't of Heath & Human Serv., 48 F.3d 114, 121 (3d Cir. 1995).

§12.04.[16]  (Pl.'s Br. at 5.)  In order to meet or medically equal the listing criteria for § 12.04, Plaintiff

must either satisfy the criteria in both Part A and Part B, or satisfy the criteria in Part C.  20 C.F.R.

---

[16]Listing § 12.04 <u>Affective Disorders</u>: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
        a. Anhedonia or pervasive loss of interest in almost all activities; or
        b. Appetite disturbance with change in weight; or
        c. Sleep disturbance; or
        d. Psychomotor agitation or retardation; or
        e. Decreased energy; or
        f. Feelings of guilt or worthlessness; or
        g. Difficulty concentrating or thinking; or
        h. Thoughts of suicide; or
        i. Hallucinations, delusions or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
        a. Hyperactivity; or
        b. Pressure of speech; or
        c. Flight of ideas; or
        d. Inflated self-esteem; or
        e. Decreased need for sleep; or
        f. Easy distractibility; or
        g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
        h. Hallucinations, delusions or paranoid thinking; or
    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND
B. Resulting in at least two of the following:
    1. Marked restriction in activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace;  or
    4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 (2001).

pt. 404, subpt. P, app. 1 § 12.04 (2001). The ALJ thoroughly reviewed the entire record and found that based on the medically determined diagnosis of depression, Plaintiff met the listing criteria of Part A under §12.04. (R. 16, 18.) However, the ALJ determined that Plaintiff failed to satisfy the listing criteria for parts B and C. (R. 18.) The Court finds the ALJ's conclusions at Step 3 is supported by substantial evidence.

With regard to the criteria in Part B, the ALJ found the limitations resulting from Plaintiff's mental impairments, as supported by the evidence, establish that restrictions of activities of daily living are mild; she has mild difficulty in maintaining social functioning; and she has moderate deficiencies in concentration, persistence or pace. (Id.) The ALJ further found that the evidence supports only one episodic event of deterioration or decompensation. (Id.) The ALJ's conclusion is supported by the following evidence: (1) the treatment records of FPA, which showed a GAF in the 61-70 range (mild symptoms/some difficulty in social and occupational functioning) continuously over a two-year period, except for one occasion in March 2003 when it decreased to 51-60, and in November and December 2004, when it rose to 73 and 71, respectively: (2) the medical report of Dr. Franzen, which indicates Plaintiff's depression is under fairly good control with treatment and assessed a GAF rating of 60; (3) Dr. Gensemer's evaluation of the "B" criteria which found mild restrictions in ADLs and moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and (4) Plaintiff's own testimony regarding her activities of daily living. None of this medical evidence shows marked difficulties in any areas, nor does the evidence show repeated episodes of decompensation. Thus, the Court concludes that Plaintiff has failed to demonstrate that she has satisfied the "B" criteria of Listing § 12.04.

In addition, the ALJ found that Plaintiff failed to satisfy the criteria in Part C, because even

14

though the evidence suggests that Plaintiff has had symptoms of depression for more than two years, and such impairment imposes more than minimal limitations upon her, the record is devoid of any evidence supporting a finding that one of the remaining conditions of Part C has been met, *i.e.,* (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or (3) a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement. In fact, the ALJ found that the evidence in the record supported the opposite conclusion. Plaintiff fails to point to any evidence in the record to show that she has met one of the remaining conditions of Part C, nor has the Court found any in its own review of the record. Therefore, Plaintiff has failed to demonstrate that the "C" criteria of Listing § 12.04 have been met.

Accordingly, the Court finds that the ALJ's finding at Step 3 is supported by substantial evidence.

### 2. The ALJ Correctly Weighed the Medical Evidence in Reaching His Finding at Step 3

Plaintiff's final challenge to the ALJ's finding at Step 3 is likewise without merit.[17] Plaintiff argues that in reaching his conclusion at Step 3, the ALJ failed to give proper weight to Dr. Goetz's

---

[17]Plaintiff remaining allegations of error in the ALJ's finding at Step 3 can be disposed of quickly. The essence of Plaintiff's allegations is that the ALJ should not have used Plaintiff's level of functioning (*i.e.,* her ability to perform ADLs and maintain social functioning in the form of AA meetings) against her in making his determination at Step 3. There is simply no merit to this argument. The "B" criteria of Listing § 12.04, as well as 20 C.F.R. § 404.1520a, specifically direct the ALJ to assess the degree of functional limitation in arriving at a determination of whether the listing criteria have been met.

and Ms. McKee's[18] opinion that Plaintiff was unable to work.  Moreover, Plaintiff contends that had

the ALJ accorded Dr. Goetz's opinion proper weight and considered it along with Dr. Franzen's

report, which found that Plaintiff demonstrated "signs of variable attentional processes with some

deficits in sustained attention and concentration" (R.361), the ALJ would have concluded at Step 3

that Plaintiff's mental impairment met or is equivalent in severity to Listing § 12.04, and therefore,

would have determined that Plaintiff is disabled under the Act. (Pl.'s Br. at 6-7.)   The Court finds

no merit to Plaintiff's argument.

        As an initial matter, the Court notes that the ultimate decision as to whether a claimant is

disabled under the Act is reserved to the Commissioner.  20 C.F.R. § 404.1527(e); SSR 96-5p (July

2, 1996).  In addition, the opinion of a treating physician is accorded controlling weight only to the

extent it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques,

and is not inconsistent with the other substantial evidence in the record." Fargnoli v. Massanari, 247

F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)).

        Here the ALJ found that Dr. Goetz's opinion was not supported by the underlying treatment

records, because the FPA treatment records reveal that (1) Plaintiff's memory, powers of attention

and concentration, speech, and thought are generally found to be within normal limits; (2) an absence

of delusions, hallucinations, or suicidal ideations; (3) her condition has been stable under prescribed

medication; and (4) an overall GAF rating of 71 to 73, indicating no more than mild impairment of

function.  (R. 19.)  The Court has closely reviewed the record and finds substantial evidence exists

to support the weight accorded to Dr. Goetz's opinion by the ALJ.

---

        [18]Melissa McKee is a licensed social worker and not a physician, psychologist, or other acceptable medical
source.  Therefore her opinion as to Plaintiff's ability to work is not entitled to any significant weight.  20 C.F.R. §
404.1527(a)(2).

The treatment records of FPA for 2003 and 2004 indicate that the Plaintiff's GAF was consistently in the 61-70 range, except for one visit on March 4, 2003. As noted above, a GAF range of 61-70 is indicative of mild symptoms, and some difficulty in social and occupational functioning, but generally functioning pretty well. Moreover, on her last two visits in 2004, the last one occurring only two months before Dr. Goetz issued his opinion letter, the GAF rating was 73 and 71,[19] respectively. Notably absent are any treatment records between December 2, 2004 and the date of Dr. Goetz's letter (February 10, 2005) showing any change in Plaintiff's condition since the December 2nd visit, at which time the clinician assessed a GAF of 71. The FPA treatment records also consistently noted over the two-year treatment period that Plaintiff's appearance/attitude/behavior, motor, speech, thought process and content, perception, orientation, attention and memory were within normal limits. On many of her visits to FPA, the clinician reported a decrease in depressive symptoms and/or continued improvement. Accordingly, the FPA treatment records do not support Dr. Goetz's opinion that Plaintiff is unable to work.

Not only do the treatment records of Dr. Goetz's own practice (FPA) support his opinion, almost all of the remaining medical evidence does not support his finding of disability.[20] In assessing Plaintiff's degree of functional limitation in the areas of concentration, persistence and pace, the ALJ accorded substantial weight to the opinion of Dr. Franzen, because the ALJ found him to be highly qualified in the specialty of neuro-psychology. Dr. Franzen reported on February 13, 2003 that

---

[19]The GAF ratings of 73 and 71 are slightly above the 61-70 range and therefore indicate even less restriction on Plaintiff's functioning.

[20]Although Plaintiff does not refer to the report of Dr. Mills, the Court notes that Dr. Mills evaluated Plaintiff on one occasion, November 21, 2003, and found Plaintiff's ability to functioning was very poor. (R. 546.) However, none of the other treating physicians ever assessed Plaintiff's level of functioning to be any worse than moderately limited. The treatment records both before and after Dr. Mills evaluated Plaintiff show Plaintiff is functioning at a higher level, including the treatment records of FPA, at which she sought treatment regularly over a two-year period, up to two months before the hearing.

Plaintiff demonstrated "signs of variable attentional processes and some deficits with sustained attention and concentration", and assessed a GAF of 60, which indicates moderate difficulty in social and occupational functioning.  The ALJ also noted the longitudinal treatment records of FPA, which continuously reported Plaintiff's attentional and memory processes to be within normal limits.  However, as to this later evidence, the ALJ appears to reject it in favor of Dr. Franzen's opinion, when the ALJ concludes that Plaintiff is moderately limited in her ability to maintain attention and concentration.  (R. 17.)  The ALJ bolsters this conclusion by finding it consistent with the opinion of Dr. Gensemer, who also assessed moderate difficulty in maintaining social functioning, concentration, persistence and pace.  (R. 560.)

The problem, according to Plaintiff, is that in rejecting Dr. Goetz's opinion, the ALJ now relies on the very evidence that he appears to reject in assessing Plaintiff's ability to maintain concentration, persistence and pace, *i.e.,* the FPA treatment notes indicating Plaintiff's memory and attention processes are within normal limits.  (Pl.'s Br. at   6.)  Although Plaintiff's argument may have some appeal on the surface, it does not pass muster when the Court ventures beneath the surface.  Obviously, it is somewhat inconsistent for the ALJ to rely on the FPA treatment records noting Plaintiff's attention and memory for one part of his analysis, and to reject these same notes in another part of his analysis.  Nonetheless, the FPA treatment notes contain other evidence regarding Plaintiff's condition which was not treated inconsistently by the ALJ, and which supports the weight the ALJ accorded to Goetz's opinion, *e.g.,* Plaintiff's GAF rating, appearance/attitude/behavior, speech, motor, thought process, perception, and lack of delusions and suicidal and homicidal ideations.

In addition, the opinions of Dr. Franzen and Gensemer both find that Plaintiff has moderate

18

difficulty in social functioning, concentration, persistence and pace at Step 3; however, this evidence does not provide a basis for according controlling weight to Dr. Goetz's finding of disabled because in order for the ALJ to find Plaintiff disabled at Step 3, the evidence must show that Plaintiff's mental impairment meets or is equivalent in severity to a listed mental disorder.   20 C.F.R. §404.1520a(d)(2).  In order to meet the "B" criteria under Listing § 12.04, the evidence must show that Plaintiff's MDD results in a marked restriction in ADLs or marked difficulties in maintaining social functioning, concentration, persistence or pace.  20 C.F.R. pt. 404, subpt. P, app. 1 § 12.04 (emphasis added).  Doctors Franzen and Gensemer both concluded that Plaintiff has moderate difficulties in these areas of functioning. These assessments fall short of the requirement of "marked" restrictions in functioning contained in the "B" criteria.

Thus, even without the FPA treatment notes regarding Plaintiff's attention and memory, the record contains substantial evidence which supports the ALJ's finding at Step 3.

### 3. The ALJ's Reliance on VE's Answer to First Hypothetical Question is Supported by Substantial Evidence

Finally, Plaintiff takes issue with the ALJ's failure to adopt the opinion of the VE in response to the second hypothetical question, despite the testimony and medical evidence.  Plaintiff argues, in essence, that since the ALJ asked the second hypothetical question, it must have been supported by the testimony and medical evidence.  (Pl.'s Br. at 7.)  This argument is likewise without merit.

As held by the United States Court of Appeals for the Third Circuit, an ALJ's hypothetical question "must reflect all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing Podedworny v. Harris, 745 F.2d 210, 218 (3d

19

Cir. 1984); <u>Wallace v. Sec'y of Health & Human Serv.</u>, 722 F.2d 1150, 1155 (3d Cir. 1983)).  If the hypothetical question is not supported by the record, then the answer cannot be substantial evidence. <u>Id</u>.

In this appeal, the ALJ correctly determined that the medical evidence did not support an "extreme impairment" in ADLs, social or occupational functioning, or concentration, persistence or pace.[21]  Therefore, the ALJ was not required to adopt the VE's opinion in response to the second hypothetical question, which included an "extreme impairment" in functioning.  Moreover, Plaintiff substantial evidence supports the ALJ's assessment of the Plaintiff's RFC and the first hypothetical question which assumed a claimant with Plaintiff's limitations, *i.e.,* capable of performing work at the light exertional level; lifting up to twenty pounds occasionally; capable of standing, walking or sitting up to six hours in an eight-hour work day, but no more than thirty minutes at a time; limited to simple and repetitive tasks; and would not require close interaction and cooperation with co-workers, frequent changes in job assignments, independent decision-making, or similar sources of high level work place stress. Therefore, because the hypothetical question relied on by the ALJ reasonable reflected all of Plaintiff's impairments and limitations supported by the record, the VE's response constitutes substantial evidence.  Accordingly, the Court finds the ALJ's conclusion at Step 5 is supported by substantial evidence.

III.  **Conclusion**

For the reasons set forth above, it is recommended that Defendant's Motion for Summary Judgment  (Doc. No. 23) be granted, and Plaintiff's Motion for Summary Judgment (Doc. No. 21)

---

[21]<u>See</u> discussion, <u>supra</u>, in Section E.1. and 2.

be denied.  It is further recommended that the decision the Commissioner of Health & Human Services denying Plaintiff's application for disability insurance benefits, pursuant to 42 U.S.C. §405(g), be affirmed.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72.1.4(B) of the Local Rules for Magistrates, within ten (10) days after being served with a copy, any party may serve and file written objections to this Report and Recommendation.  Any party opposing the objections shall have ten (10) days from the date of service of objections to respond thereto. Failure to file timely objections may constitute a waiver of any appellate rights.

Dated: February 12, 2007                                  Respectfully submitted,


                                                            s/Lisa Pupo Lenihan
                                                          LISA PUPO LENIHAN
                                                          U. S. Magistrate Judge

cc:     Honorable Terrence F. McVerry
        United States District Judge

        All Counsel of Record
        *Via Electronic Mail*